UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHN DeLOLLIS, TOM HOLSMAN, DOUGLAS McCARRON, and FRANK SPENCER in their capacities as TRUSTEES of the EMPIRE STATE CARPENTERS WELFARE FUND, EMPIRE STATE CARPENTERS ANNUITY FUND, and EMPIRE STATE CARPENTERS PENSION FUND,<br>    Plaintiffs,<br><br>    v.<br><br>FRIEDBERG, SMITH & CO., P.C.,<br>    Defendant. | No. 3:12-cv-00305 (SRU) |

## RULING ON MOTION TO DISMISS

This case is one of many that have arisen as a result of the collapse of Bernard L. Madoff's historic Ponzi scheme. Here, the trustees of three employee benefit plans that invested assets in a fund that in turn invested money in Madoff-related investment vehicles, bring suit against an accounting firm. The plaintiffs allege that the accounting firm's negligence in auditing the investment fund's financial statements caused the employee benefit plans to suffer losses when the trustees relied on those audit reports to decide whether to invest in the fund, in Madoff-related investment vehicles, and to enter into merger agreements. The accounting firm has moved to dismiss the trustees' sole claim of "negligence and professional malpractice."

For the reasons stated below, defendant's motion to dismiss, doc. 25, is granted.

**I.   Standard of Review**

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is designed "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which

might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and decide whether it is plausible that the plaintiff has a valid claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (quotation marks omitted). *Plausibility* at the pleading stage is nonetheless distinct from *probability*, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely." *Id*. at 556 (quotation marks omitted).

## II.   Background[1]

The plaintiffs are trustees of three multi-employer employee benefit funds, the Empire State Carpenters Welfare Fund, Empire State Carpenters Annuity Fund, and Empire State

---

[1] Unless otherwise noted, all background information is taken from plaintiffs' First

Carpenters Pension Fund (collectively, the "Empire Funds"), and are responsible for deciding what investments the Empire Funds make. First Am. Compl. at ¶¶ 5-6.

In 2003, the Empire Funds first invested in Beacon Associates LLC, Beacon Associates LLC I, and Beacon Associates LLC II (collectively, "Beacon"). *Id.* ¶ 12. Beacon had a substantial portion of its assets (approximately 73 percent) invested with Bernard L. Madoff or Bernard L. Madoff Investment Securities LLC (collectively, "Madoff"). *Id.* ¶ 20. Between 2003 and Bernard L. Madoff's arrest in December 2008, the Empire Funds continued to hold, make, and obtain tens of millions of dollars in investments in Beacon and other Madoff-related investment vehicles. *Id.* ¶¶ 12-16.

After June 2007, the Empire State Carpenters Pension Fund ("Empire Pension Fund") agreed to merge with a number of other funds that had made capital investments in Beacon and other Madoff-related investments, including the Niagara-Genesee & Vicinity Carpenters Local No. 280 Pension Trust Fund and the Upstate New York Carpenters Pensions Fund. *Id.* ¶ 17. The value of these funds' assets at the time of the merger included approximately $4.5 million in Beacon and $69 million in other Madoff-related investments. *Id.* The merger agreements required that all of the assets of the merging funds—including the assets invested with Beacon and other Madoff-related investments—become assets of the Empire Pension Fund. *Id.* ¶ 18.

During this period, the defendant, Friedberg, Smith & Co., P.C. ("Friedberg, Smith") was responsible for performing annual audits of Beacon's financial statements and each year would issue its auditor's report of Beacon. *Id.* ¶¶ 20-21. These reports represented that Friedberg, Smith's audit included an examination of evidence supporting the amounts and disclosures in the financial statements, assessed the accounting principles used and estimates made by

---

Amended Complaint and is assumed to be true for purposes of this motion.

management, and evaluated the overall financial statement preparation.  *Id*. ¶ 21.  Friedberg, Smith also prepared audit reports of Beacon representing that, in its opinion, the financial statements of Beacon presented fairly the financial position and the results of Beacon's operations and changes in net assets in conformity with generally-accepted accounting principles.  *Id.* ¶ 22.  In addition, Friedberg, Smith audited the statement of changes in the Empire Funds' capital accounts with Beacon, which reported the purported value of the Empire Funds' investments.  *Id.* ¶ 23.

As Beacon's auditor and as the auditor of statements of changes in the Empire Funds' capital accounts, Friedberg, Smith was required to perform its work in adherence with Generally Accepted Auditing Standards ("GAAS") to determine whether the financial statements of Beacon were prepared in conformity with Generally Accepted Accounting Principles ("GAAP").  *Id*. ¶ 30.  Friedberg, Smith was also subject to professional standards, including the code of Professional Conduct, promulgated by the American Institute of Certified Public Accountants ("AICPA").  *Id.*

None of Friedberg, Smith's audit reports disclosed any concerns regarding the reported value of Beacon assets invested with Madoff or regarding the reported value of the Empire Funds' capital accounts with Beacon.  *Id.* ¶ 37.  Specifically, Friedberg, Smith's audits failed to give any indication that the assets invested with Madoff might be non-existent or that the reported value of those investments could be inaccurate or fictitious.  *Id.*  Instead, the audits repeatedly opined that the financial statements "fairly represented the financial position of Beacon and of the Empire Funds' capital accounts with Beacon."  *Id.*  None of the audit reports gave any indication that Friedberg, Smith had not obtained or could not obtain enough information about the entity in which Beacon had invested a majority of its assets in order to

reasonably form an unqualified opinion that Beacon's financial statements were a fair representation of Beacon's financial position or the Empire Funds' accounts with Beacon. *Id.* ¶ 38. Nor did any of the audit reports give any indication that Friedberg, Smith had not complied with GAAS or include a qualified opinion or disclaimer or raise any issues that that might require a qualified opinion or disclaimer. *Id.* ¶¶ 39-40.

Plaintiffs allege that had Friedberg, Smith complied with its professional duties and competently performed proper audits, it would not have expressed an unqualified opinion on the reported values in Beacon's financial statements or the Empire Funds' capital account statements, or represented that it had complied with GAAS. *Id.* ¶ 47. Plaintiffs also allege that if Friedberg, Smith had conducted proper audits or expressed an opinion reflecting its inability to determine whether Beacon's financial statements presented fairly Beacon's financial position, plaintiffs would have been required to withdraw and liquidate all of the Empire Funds' holdings with Beacon and other Madoff-related investments. *Id.* ¶ 50. Likewise, the Empire Fund would not have obtained additional investments in Beacon and other Madoff-related investments through the mergers. *Id.* ¶ 51.

On March 1, 2012, the Trustees brought suit in this court against Friedberg, Smith in an action to recover losses. On, May 14, 2012, the Trustees filed their First Amended Complaint.[2]

---

[2] Friedberg, Smith has been a defendant in at least four prior actions brought in New York federal and state courts over the past three years, in which similarly-situated investors sued Friedberg, Smith and other defendants, including Beacon's managing member and its principals. *See In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386 (S.D.N.Y. 2010) ("Beacon Action") (claims dismissed against Friedberg, Smith); *Sacher v. Beacon Assocs. Mgmt. Corp.*, 910 N.Y.S.2d 765 (Sup. Ct. Nassau Co. 2010) (on appeal before New York's Second Appellate Division); *Jordan Group LLC v. Beacon Assocs. Mgmt. Corp.*, Index No. 3757/2011 (Sup. Ct. Nassau Co. 2010) (deferred in light of *Sacher* appeal); *McBride v. KPMG Int'l*, Index No. 650632/2009 (Sup. Ct. N.Y. Co.) (Friedberg, Smith's motion to dismiss submitted and awaiting decision since March 29, 2011). Plaintiffs here brought claims against Ivy Asset Management, J.P. Jeanneret Associates, Inc., plaintiffs' own investment manager, and others in a separate action in New

### III.    Discussion

Friedberg, Smith now moves to dismiss plaintiffs' negligence and professional malpractice claim, the sole claim against it.

  A.  Choice of Law

As an initial matter, I must decide which state's law governs this dispute. In diversity cases, federal courts apply the choice-of-law rules of the forum state. *Gilbert v. Seton Hall Univ.*, 332 F.3d 105, 109 (2d Cir. 2003) (citing *Klaxon Co. v. Stentor Elect. Mfg. Co.*, 313 U.S. 487, 496-97 (1941)). "The threshold choice of law question in Connecticut is whether there is an outcome determinative conflict between the applicable laws of the states with a potential interest in the case." *Brown v. Strum*, 350 F. Supp. 2d 346 (D. Conn. 2004). If there is no conflict between the applicable laws of the states with an interest in the case, there is no need to perform a choice-of-law analysis and the law common to the jurisdictions should be applied. *Id.*

Connecticut and New York law on the relevant issues are not identical in all respects. For example, Connecticut courts have not settled on a single test for accountants' liability to non-clients. *See Ret. Programs for Employees of Town of Fairfield v. NEPC*, 642 F. Supp. 2d 92, 96-97 (D. Conn. 2009) (discussing application of *Ultramares* line of cases and Restatement (Second) of Torts to determine auditors' liability to non-clients under Connecticut law). Plaintiffs, without conceding that New York law applies to all substantive issues at all stages of this case, apply New York law in their brief. Defendant concedes that the choice of law is not determinative of this motion. Accordingly, for purposes of this motion, I apply New York law.

  B.  "Negligence and Professional Malpractice" Claim

---

York federal court, seeking damages for various Madoff-related losses. *See Harman, et al. v. Ivy Asset Mgmt., L.L.C., et al.*, 01:2009-cv-08278-LBS (S.D.N.Y. 2009).

Plaintiffs' sole claim is for "negligence and professional malpractice."[3]  Plaintiffs allege that Friedberg, Smith, in failing to follow accounting standards and principles, negligently offered an unqualified opinion concerning the correctness and propriety of Beacon's financial statements, particularly with respect to Beacon's Madoff-related holdings, leading to the Empire Funds' investments, mergers, and, ultimately, losses.  This claim is premised on the theory that the auditor of an investment fund in which plaintiffs invested owed a duty directly to them to ensure that the entities in which the investment fund invested had correctly and honestly reported the value of the investment funds' investments.

Friedberg, Smith contends that it owed no duty to plaintiffs and also that the negligence claim must fail because plaintiffs did not adequately allege that Friedberg, Smith proximately caused Beacon's loss or that Beacon relied on Friedberg, Smith in making investment decisions. Specifically, Friedberg, Smith argues that: (1) Madoff's "unprecedented and unforeseeable fraud . . . operates as an intervening cause" and (2) the plaintiffs fail to show proximate cause between Friedberg, Smith's alleged misconduct and the harm suffered by plaintiffs with respect to their decision to invest in non-Beacon vehicles and to merge with funds that already had Beacon and other Madoff-related investments.

1. *Auditors' Duties and Liabilities to Non-Clients*

The threshold question in any negligence action is whether the defendant owes a legally recognized duty of care to the plaintiff.  *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232, 750 N.E.2d 1055, 1060 (2001), *opinion after certified question answered*, 264 F.3d 21 (2d Cir. 2001).  "[A]ccountants owe a duty of care to (a) those with whom they have contracted and (b)

---

[3] The amended complaint brings a claim for "negligence and professional malpractice." Plaintiffs' opposition brief styles the claim as one for "professional negligence and negligent misrepresentation."  However styled, the plaintiffs must sufficiently allege that the defendant

- 7 -

those [third parties] with whom they have a 'relationship so close as to approach that of privity.'" *BHC Interim Funding, L.P. v. Finantra Capital, Inc.,* 283 F. Supp. 2d 968, 984 (S.D.N.Y. 2003) (quoting *Parrott v. Coopers & Lybrand*, 95 N.Y.2d 479, 483, 718 N.Y.S.2d 709, 711, 741 N.E.2d 506, 508 (2000)). Friedberg, Smith has not contracted with plaintiffs, thus I must determine whether the parties here have a relationship that approaches "near privity."

Under the doctrine first expressed in *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931), and established in *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985), an auditor can be held liable for damages suffered by a non-client due to reliance on negligently prepared audit reports where a sufficient relationship exists between them. In *Credit Alliance,* the New York Court of Appeals set forth a three-part test to determine when parties who are not in direct privity with accountants have a relationship sufficient to hold them liable in a negligence action. The court required that,

> (1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance.

*Id.* at 551, 493 N.Y.S.2d at 443, 483 N.E.2d at 118; *see Saltz v. First Frontier, LP*, 782 F. Supp. 2d 61, 83 (S.D.N.Y. 2010), *aff'd sub nom.*, *Saltz v. First Frontier, L.P.*, 485 F. App'x 461 (2d Cir. 2012).

In *Saltz*, the plaintiffs, trustees of funds that invested in feeder funds to Madoff, alleged that they received financial statements from the auditor defendants who "knew that their [reports] would be provided to the Fund's Members and potential investors in the Fund and would be relied on by them in making investment decisions concerning the Fund." 782 F. Supp. 2d at 83-84. The court held that such a "broad allegation of a duty owed to all potential investors

---

owed a duty of care to them.

- 8 -

is not sufficient to demonstrate a 'near privity' relationship." *Id.* at 84.  Plaintiffs make similar allegations here.  Plaintiffs allege that they received audit reports and a statement of changes in capital accounts, Am. Compl. ¶¶ 23, 26, 28, and that Friedberg, Smith "knew and intended that its audit reports would be provided to investors in Beacon, including the Empire Funds . . . [and] that the Empire Funds would rely on the audit reports . . . regarding their investment holdings in Beacon," *id.* ¶ 29.  Thus, defendant argues that the instant case is analogous to *Saltz* and that plaintiffs have failed to establish sufficient privity.  There are key allegations in the amended complaint, however, that present a closer question here than those before the *Saltz* Court.

Plaintiffs have satisfied the first two prongs of the *Credit Alliance* test.  Plaintiffs have alleged that Friedberg, Smith was aware that the audit reports would be used and relied upon to make and hold investments in Beacon, satisfying the first prong of the test.  Plaintiffs have also alleged that Friedberg, Smith was aware that the Empire Funds, specifically, would rely on the reports, satisfying the "known party" prong of the test.  The third prong of the *Credit Alliance* test, which requires that there be some "linking conduct" between the auditor and non-client establishing the auditors' understanding of the non-client's reliance, presents the closest question.  Two allegations potentially constitute "linking conduct."  First is the allegation relating to the statement of changes in the Empire Funds' capital accounts.  Insofar as these statements directly identify the Empire Funds, one could plausibly argue that the accountants understood that the Empire Funds would rely on them to make or keep their investments.  The second allegation, which implicates more strongly the "linking conduct" prong of the *Credit Alliance* test, is that "[d]efendant specifically addressed [the audit] reports to the Empire Funds and provided them to the Empire Funds."  Am. Compl. ¶ 29.  Unlike in *Saltz*, the plaintiffs here have not merely alleged a broad duty, but have alleged that the defendant specifically addressed

- 9 -

the audit reports to them.  In *Anwar v. Fairfield Greenwich Ltd.* ("Anwar II"), upon which plaintiffs rely, the court held that similarly-situated plaintiffs had established sufficient privity because plaintiffs' allegations that the accountant addressed financial reports to the plaintiffs showed "linking conduct evincing the [auditor's] understanding of the investor's reliance."  728 F. Supp. 2d 372, 456 (S.D.N.Y. 2010).

      The New York cases that defendant cites in support of its argument that plaintiffs have failed to establish sufficient privity with Friedberg, Smith are distinguishable.  Defendant cites a New York Appellate Division case, *Houbigant, Inc. v. Deloitte & Touche*, 303 A.D.2d 92, 94-95, 753 N.Y.S.2d 493 (App. Div. 2003), as an instance in which a New York court denied a plaintiff's negligence claim under the *Credit Alliance* test "despite the fact that the auditor had specially and directly sent it a copy of the client's financial statements."  Defendant's reliance on *Houbigant* is somewhat misplaced.  In *Houbigant*, the auditor merely consented to the mailing of the financial statement; it did not mail the financial statement to the plaintiff itself.  Defendant also cites *Meridian Horizon Fund, L.P. v. Tremont Group Holdings*, 2012 WL 2754933 (2d Cir. July 10, 2012).  In that case, the Second Circuit Court of Appeals affirmed the lower court's holding that the plaintiff-investor failed to satisfy both the "known party" requirement and the "linking conduct" requirement of the *Credit Alliance* test.  The court reasoned that the allegation that auditors addressed their audit reports to "The Partners" of the fund was not sufficient linking conduct because the fund itself, rather than the auditors, sent the report to the limited partners. *Id.*, at *4.  In *CRT Investments, Ltd. v. BDO Seidman, LLP*, 85 A.D.3d 470, 925 N.Y.S.2d 439 (App. Div. 2011), plaintiffs invested in a hedge fund managed by Madoff and audited by the defendant, BDO Seidman.  Plaintiffs brought a claim against BDO Seidman alleging that BDO Seidman knew that the hedge fund made false representations in financial documents and that the

accountant's audit did not conform to generally accepted accounting standards. That court found that the fact that plaintiffs were entitled to and received a copy of the audited financial statements or that auditor knew that the investors would rely upon the information contained in the financial statements, did not establish the requisite linking conduct. *Id.*, 85 A.D.3d at 472, 925 N.Y.S.2d at 441.

Although the factual distinctions among these cases are slight, they are meaningful. A direct communication from an auditor to a non-client that evinces the auditor's understanding of the non-client's reliance on that communication satisfies the "linking conduct" prong of the *Credit Alliance* test. As the *Anwar* court noted in distinguishing *CRT* and *Meridian Horizon*, in neither case did the plaintiff allege that the auditor agreed to provide audit reports directly to the plaintiffs or that the defendant knew that providing such information to investors was the primary purpose of its engagement. *See Anwar v. Fairfield Greenwich Ltd.* ("Anwar III"), 2012 WL 3245478, at *5 (S.D.N.Y. Aug. 6, 2012). I find it compelling, as did the *Anwar* court, *id.*, at *4, that the auditors recognized that their reports would be communicated directly to investors, who might thus rely on those financial statements to make investment decisions.

Defendant argues that documents recently produced in discovery show that Beacon, and not Friedberg, Smith, distributed the audit reports to the Empire Funds. In response, plaintiffs assert that these documents, in fact, support their claim that Friedberg, Smith specifically addressed the documents to the Empire Funds and, further, that they show that Friedberg, Smith prepared a separate audit report specifically for the Empire Funds. I need not consider those documents, as they are not properly before the court at this stage in the proceedings. My inquiry here is limited to the allegations pled in plaintiffs' amended complaint. Without considering those recently-produced documents, and reading the amended complaint in a light most

favorable to the plaintiffs, I find that plaintiffs have sufficiently alleged that defendants were in "near privity" with the plaintiffs with respect to their investments in Beacon.

The plaintiffs' amended complaint alleges that Friedberg, Smith *directly* addressed the audit reports to the Empire Funds and knew that they would use them when deciding whether to make investments in Beacon. The plaintiffs have pled facts sufficient to allege: (1) Friedberg, Smith's awareness that the reports would be used for the purpose of making investments in Beacon; (2) in the furtherance of which a known party was intended to rely; and (3) conduct on Friedberg, Smith's part linking them to plaintiffs, which evinced defendant's understanding of plaintiffs' reliance. I do not find, however, that defendants were in "near privity" with respect to non-Beacon, Madoff-related investments or the merger decisions. Friedberg, Smith could not have expected plaintiffs to rely on the audit reports of Beacon for the purpose of making or holding investments in non-Beacon, Madoff-related investments or entering into merger agreements with other pension funds.

    2. *The Scope of Friedberg, Smith's Duties to the Plaintiffs*

Having determined that plaintiffs allege sufficient privity with defendant, I next turn to the question of what duty of care Friedberg, Smith owed to plaintiffs. Plaintiffs argue that Friedberg, Smith breached a duty to adhere to accounting standards and to exercise reasonable care and competence in preparing and communicating their audit reports. Although plaintiffs have plausibly alleged that Friedberg, Smith had a relationship sufficient to hold them liable for violation of a duty of care under the *Credit Alliance* test, they still must show the nature and scope of that duty. Particularly, they must allege facts sufficient to establish that the duty of care included a responsibility to plaintiffs to verify the accuracy, existence, or value of Madoff's

purported holdings; in other words, to audit Madoff or the Madoff funds. Plaintiffs have not adequately done so here.

Plaintiffs' amended complaint alleges non-specific violations of accounting standards and principles. At oral argument, I was unconvinced that the amended complaint sufficiently described the nature of the claimed violations to plausibly allege a breachable duty. Thus, I asked both parties to submit supplemental briefing on the question of the scope of Friedberg, Smith's duties to the plaintiffs. In their supplemental briefing, plaintiffs articulate more clearly what duty of care defendant allegedly violated and attempt to locate that duty of care in specific GAAS requirements.[4] Plaintiffs take care not to directly state that Friedberg, Smith had a duty to *audit* Madoff. Rather, citing AICPA guidance on "alternative investments," they argue that defendants violated a duty to verify the existence and value of assets held by a third party – Madoff – before issuing an unqualified audit opinion regarding Beacon. According to plaintiffs, Friedberg, Smith was required to do more than to rely on third-party confirmations they received directly from Madoff when issuing their audit opinions.

The audited entity's management is responsible for the fair presentation of financial statements. AU § 326.14. The auditor's responsibility is "to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." AU § 110.02 (footnote omitted). Although AICPA stresses the importance of exercising "professional skepticism" when considering the statements of management, AU § 316.13, it recognizes that an auditor is not infallible and that there is always a risk that an auditor might erroneously conclude that a financial statement is free of misstatement. An auditor is able to obtain "reasonable, but not absolute, assurance that material

---

[4] GAAS includes statements on auditing standards that are codified as "AU" sections.

- 13 -

misstatements are detected," AU § 110.02, thus, fraudulent acts may lead even a properly executed audit to fail to detect a material misstatement, *see* AU § 230.12. AICPA states it clearly: "Since the auditor's opinion on the financial statements is based on the concept of obtaining reasonable assurance, the auditor is not an insurer and his or her report does not constitute a guarantee." AU §§ 230.10, 230.12, 230.13.

Recognizing the limitations on an auditor's ability to guarantee the accuracy of management's financial statements, AICPA provides guidance on how to gather audit evidence to limit the risk of an auditing failure. Such audit evidence may include third-party confirmations of information reported in the financial statements of the audited entity. AU §§ 326.05, 326.37. Plaintiffs assert that AICPA guidance on the third-party verification process imposes a duty on auditors to test the existence, ownership, value, and allocation of assets. AICPA guidance describes when such tests may be required, such as when alternative investments comprise a large portion of total assets and the total investment portfolio of an entity.[5] In such circumstances, an auditor may be required to independently obtain additional audit evidence and additional evidence of the asset's existence and value. AU § 332.21. Additionally, when an audited entity's value is based on a third party's financial results, the

---

Plaintiffs and defendant have attached various AU sections to their supplemental briefing.

[5] Defendant argues that the AICPA literature on "alternative investments" plaintiffs cite in support of this proposition does not apply to Beacon's investments in Madoff because those investments were not alternative investments. Defendant is correct that the alternative investments literature does not apply; however, similar guidance is promulgated in AU § 332.08, which applies to debt and equity securities. Plaintiffs' reference to consideration of the proportion of an audited entity's assets invested in alternative investments, although drawn from inapplicable literature, nevertheless reflects the general principle that an auditor should evaluate the risk of a material misstatement and that the risk of material misstatement is related to the complexity of the features of derivatives or securities. *See* AU § 332.08. Plaintiffs also cite to AU § 9328 in support of their contentions regarding an auditor's duty to verify the existence of investments held by third parties. That section applies to "auditing interests in trusts held by a third-party trustee and reported at fair value" and, therefore, is inapplicable here.

auditor must obtain sufficient appropriate audit evidence in support of the third-party's financial results and may also consider "performing procedures such as making inquiries as to the professional reputation and standing of the other auditor, visiting the other auditor, and discussing the audit procedures followed and results thereof, and reviewing the audit program and/or working papers of the other auditor." AU § 332.28.

Plaintiffs argue that Friedberg, Smith never tested the existence of assets that Madoff claimed to have purchased with Beacon funds, pointing to nearly $330 million in Treasury bills Madoff claimed to have purchased on Beacon's behalf. Although AICPA, in some instances, provides additional guidance to auditors dealing with alternative investments, e.g., complex derivatives and hedging instruments, the investments with Madoff at issue here were publicly-traded securities with a readily-ascertainable market value.[6] In such circumstances, the auditor may rely on third-party confirmation of their existence; there does not appear to be any obligation to confirm the holding of such securities other than, perhaps, by seeking confirmation from Madoff. Plaintiffs suggest that, because Beacon had a large percentage of assets with Madoff, Friedberg, Smith was required to do much more, including: to audit Madoff, to inquire into his reputation, or to otherwise verify the existence of those assets. The GAAS guidance plaintiffs and defendant have submitted to the court does not contemplate such a broad duty. The auditor, under GAAS, is to "obtain sufficient appropriate audit evidence by performing audit procedures to afford a reasonable basis for an opinion of the financial statements under audit."

---

[6] Defendant also argues that confirmation of the existence of these securities would have been unreasonable because such securities are usually registered in their street name, and, thus, would not likely have been traceable to Beacon. Further, defendant argues, additional efforts to confirm that Madoff held these assets would have been limited to inquiring with regulators who, as is well-known, also failed to detect Madoff's fraud.

AU § 326.01.  Nowhere does the literature state the auditor is required to audit the third party, especially with respect to confirmation of the existence or value of publicly-traded securities.

After review of both parties' submissions, I find it difficult to discern how Friedberg, Smith could have been required to do more than rely on third-party confirmations, specifically to independently verify Madoff's confirmations and conduct a more involved search for and analysis of audit evidence, without having a duty to audit the Madoff entities.  I remain unconvinced by the argument that, under GAAS, auditors owe a duty to non-clients to conduct what amounts to an audit of the accounts of entities in which their clients have invested, or to do more than rely on the third-party confirmations from those entities, when engaged in auditing their client's financial statements.

The nature of plaintiffs' claim recommends caution.  To hold an auditor liable to a non-client for failure to sufficiently verify assets of another non-contractual party would impose an almost universal duty and unlimited potential liability on auditors.  Although the *In re Tremont* and *Meridian Horizon* courts were addressing fraud rather than negligence claims, and hence dismissed similarly-situated plaintiffs' claims on different grounds, their basic reading of the plaintiffs' allegations also holds here.[7]  *See In re Tremont,* 703 F. Supp. 2d 362, 369 (S.D.N.Y. 2010); *Meridian Horizon*, 747 F. Supp. 2d at 412.  Friedberg, Smith was not hired to audit

---

[7] In *Tremont* and *Meridian Horizon*, plaintiffs were faced with meeting the "demanding" standard for pleading auditor scienter in order to state a claim under Section 10(b) of the Exchange Act.  *See In re Tremont,* 703 F. Supp. 2d at 369; *Meridian Horizon*, 747 F. Supp. 2d at 412.  For those purposes, the plaintiff must allege facts (1) showing motive and opportunity to commit fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness, which would "approximate an actual intent to act in fraud."  *In re Tremont,* 703 F. Supp. 2d at 370, *Meridian Horizon*, 747 F. Supp. 2d at 412.  The court held that mere allegations of a "shoddy audit in violation of GAAS" do not establish the necessary intent.  *In re Tremont,* 703 F. Supp. 2d at 370, *Meridian Horizon*, 747 F. Supp. 2d at 413.  In both cases, the court reasoned that because the auditor was not hired to audit Madoff, it would be unreasonable to find

Madoff or to issue an opinion of Madoff's financial statements; its only role was to audit Beacon's financial statements. "The notion that a firm engaged to audit the financial statements of one client . . . must conduct audit procedures on a third party that is not an audit client . . . on whose financial statements that audit form expresses no opinion is unprecedented and has no basis." *See In re Tremont,* 703 F. Supp. 2d at 371; *Meridian Horizon*, 747 F. Supp. 2d at 413. Upon review of the parties' submissions, I conclude that although plaintiffs have established that the defendant could plausibly owe them a duty of care, they have not alleged facts sufficient to (1) plausibly extend that duty to include a responsibility to plaintiffs to audit Madoff or (2) plausibly assert that Friedberg, Smith has breached that duty. Accordingly, I need not reach any other elements of plaintiffs' negligence claim.

### IV. Conclusion

For the reasons stated above, I grant Friedberg, Smith's motion to dismiss, doc. 25. The Clerk shall close this file.

It is so ordered.

Dated at Bridgeport, Connecticut, this 27th day of March 2013.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge

---

that they had the necessary scienter to commit securities fraud. Here, plaintiffs allege negligence, not fraud and, therefore, need not establish scienter.